S. LANE TUCKER
United States Attorney

WILLIAM A. TAYLOR
JAMES KLUGMAN
CHRISTOPHER D. SCHROEDER
Assistant U.S. Attorneys
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: william.taylor@usdoj.gov
Email: james.klugman@usdoj.gov
Email: christopher.schroeder@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>   vs.<br><br>CRAIG KING,<br><br>               Defendant. | No. 3:19-cr-00026-5-TMB |

**UNITED STATES' SENTENCING MEMORANDUM**

The United States, by and through undersigned counsel, respectfully submits this Sentencing Memorandum in anticipation of the sentencing hearing scheduled for Thursday, January 26, 2023, at 10:00 a.m. For the following reasons, the United States recommends a sentence of Life imprisonment in this case.

# SUMMARY OF SENTENCING RECOMMENDATIONS

**INCARCERATION** ................................................................................................ **LIFE**

**SUPERVISED RELEASE** ........................................................................................ **n/a**

**RESTITUTION** .......................................................................................... **$3,784.60**

**MANDATORY SPECIAL ASSESSMENT** .................................................. **$500.00**

## I. FACTUAL BACKGROUND

Craig King (a/k/a "Oakie") was an associate of the Hells Angels motorcycle gang in southern California. King had gang tattoos on his back of the letters "AFFA" (Angels Forever, Forever Angels) and "81" (representing the eighth letter of the alphabet, H, and the first letter, A):



*U.S. v. Craig King*
No. 3:19-cr-00026-5-TMB            Page 2 of 20

At some point in the mid-to-late 2000s, King and his wife Felicia moved to Wasilla, Alaska. King continued his association with the Hells Angels there and represented himself to others as a member of the gang. He also sold both drugs and guns for a living.

In Wasilla, King became friends with a man named Michael Staton (a/k/a "Steaknife"). Staton was a low-level member of the 1488s, a white supremacist prison-based gang. King eventually allowed Staton to move into his duplex home for several months in 2016. Unfortunately, the relationship soon went sour, as Felicia King accused Staton of stealing property from them, including jewelry, money, and drugs. Staton left the Kings' residence and went into hiding on the Kenai peninsula, near Homer. King sought revenge against Staton for the alleged theft.

Around this same time, Staton fell into bad standing with the 1488s. Roy Naughton (a/k/a "Thumper"), the designated leader or "key holder" of the 1488s outside of prison, tasked 1488 member Dustin Clowers with finding Staton to discipline him. Clowers's search for Staton eventually led him to the home of Craig and Felicia King in Wasilla. King told Clowers of his affiliation with the Hells Angels, leaving Clowers with the impression that King was a full member of the gang. King also told Clowers that Staton stole from him and his wife.

Once King and the 1488s realized they had a common enemy, they formed an alliance. King distributed drugs to the 1488s, and Clowers sold drugs to King in large quantities – what he described at trial as thousands of dollars' worth – for King to resell. King and the 1488s thus became mutually dependent on one another in the drug trade.

On September 10, 2016, Roy Naughton received a phone call from incarcerated 1488 member Joey Lewis. Naughton told Lewis that Staton was going to be gone "viciously," and that Lewis would hear about it. See Exhibit 377.

On September 14, 2016, Naughton received a call from Filthy Fuhrer, the overall leader of the 1488s, who was then incarcerated in the Spring Creek Correctional facility in Seward serving a 20-year sentence for the attempted murder of an Alaska State Trooper. Naughton and Fuhrer discussed punishments and discipline for various 1488s who violated the gang's rules. At one point in the call, Naughton said that he was going to "move" against Staton, who was "No more. Done." See Exhibit 378. At first, Fuhrer authorized Naughton to give Staton "the beatdown." Naughton became angry and insisted that "it's a personal level" because Staton "stole from my f***in' family and… has f***in' disrespected everybody in the car and he's running around and he f***in' ripped off Red and White." Craig King was a known associate of the Hells Angels, whose official colors of the Hells Angels are red lettering displayed on a white background – hence the gang's nickname, "The Red and White."

Fuhrer told Naughton that he was about to run out of time on the call "and I want to f***in' give you the ear that this deserves because it sounds serious and I see how passionate you are about telling me[.]" Fuhrer told Naughton to talk to "the brothers" again "and then I'll give you the greenlight."

About twenty minutes later, Fuhrer called Naughton back. See Exhibit 379. Fuhrer said, "I talked to the home boy and… that's a go on ole' Steaknife." Naughton said "Thank

you" three times. Fuhrer then cautioned Naughton that "you got to run all that by me. Anything on that level." Naughton agreed: "On that level, yes I will. Yes, I will.... That's structure, I like it.... On the little s*** though, man, you now, if I got to act, I got to act." Fuhrer responded, "Oh, I know. I know.... Just like I said, on very, very weighty decisions, I got to know."

In March 2017, 1488 member Nicholas Kozorra (a/k/a "Beast") was released from prison. Fuhrer provided Kozorra with a list of tasks and members of the gang to violently discipline on the outside once he was released. The list included Michael Staton. Dustin Clowers introduced Kozorra to King, and the men discussed their mutual desire to find Staton to punish him. King agreed to let the 1488s use his home to handle 1488s business by disciplining Staton. King became close several members of the 1488s, including Clowers, Kozorra, Glen Baldwin, and Colter O'Dell. The men would often get together at King's house to discuss business.

Dustin Clowers used an LG Phoenix 2 smartphone to communicate with King. The government introduced the Cellebrite extraction report from Clowers's phone at trial as Exhibit 539. That extraction report showed that in April 2017, Clowers texted King that he believed "Steaknife" (Staton) was hiding out somewhere on the Kenai peninsula:

| Sent | I also wanted to let u know that if your trying to find a steakknife to cut with I guess there is nice ones down south like kenai peninsula area out and about ihavent pin pointed the exact where abouts but that's the general where abouts I just thought I'd let u known |
|---|---|

On July 29, 2017 – five days before the murder – Clowers texted that he intended to deliver Staton to King:

| Sent | I Dont need help with anything I would just like to shoot the shit and deliver a certain someone to your front door |
|---|---|

King responded with a pair of enthusiastic messages indicating he was ready:

| Read | So how you doing bro I'm ready for that m*********** anytime |
|---|---|

| Read | You send that piece of s*** to me to my front door I would greatly appreciate it |

Clowers confirmed that the 1488s would exact retribution on Staton themselves and then "hand deliver him" to King:

| Sent | Yeah im aright im on ankle monitor in anchorage. But yeah my dude beast and I got plans for his ass of our own and than we will hand deliver him to u |
| Sent | Its way over due |

King thanked Clowers and said he would consider it a "very very personal favor" if the 1488s would deliver Staton to him:

| Read | Thank you so much so how are you |

*U.S. v. Craig King*
No. 3:19-cr-00026-5-TMB          Page 7 of 20

| Read | But I'll take it as a very very personal favor if I can get my hands on that son of a b**** |
|---|---|

On August 3, 2017, Kozorra was finally able to lure Staton to Anchorage. Staton drove up from where he had been hiding in Homer in a stolen Chevrolet Malibu. He met up with Kozorra, Clowers, and Kozorra's girlfriend Taylor Lack in south Anchorage. Clowers got into the Malibu with Staton to drive out to Wasilla to buy drugs, while Kozorra and Lack drove separately. At 1:22 p.m., Clowers, who was sitting next to Staton in the car, texted King that Staton was on his way:

| Sent | I'm riding in the passenger seat next to steaknife |
|---|---|

Once King received that message, he began to prepare. He called Beau Cook, a low-level drug dealer and heroin addict who associated with both the Hells Angels and the 1488s. He told Cook that "they" had Staton and were bringing him to King's duplex. He asked Cook to come over. When Cook arrived, King met him in the driveway and said that Staton was on his way there. King told Cook that Staton was going to be beaten and depatched – a term referring to the forcible removal of a tattoo Staton had on his torso of a swastika wrapped around an iron cross that proved one's membership in the 1488s. King

did not want this done in his half of the duplex, so they decided to use the vacant half. Cook selected a room and laid painter's plastic down over the carpet and walls to prevent any blood from being left behind. King asked Cook to stand by and make sure nothing happened to him while he got his "licks in" on Staton.

Meanwhile, the 1488s' group arrived drove to an abandoned garage / trap house on Hay Street, where 1488 member Glen Baldwin (a/k/a "Glen Dog") and 1488 prospect Colter O'Dell were waiting in a maroon Chevrolet Tahoe. Once Staton got out of the car, the four gang members present - Kozorra, Clowers, Baldwin, and O'Dell – attacked him, beat him, and bound his hands and feet with duct tape and rope. They forced him into the trunk of the Malibu and started driving towards Craig King's house.

The group arrived at King's residence around 4:30:



*U.S. v. Craig King*
No. 3:19-cr-00026-5-TMB                Page 9 of 20

They brought Staton inside the vacant half of the duplex, to the kill room Beau Cook had covered with plastic:



There, King, Kozorra, Clowers, Baldwin, and O'Dell, proceeded to severely beat Staton for an extended period of time with their hands and feet. At trial, Dustin Clowers described Staton as lying on the ground, trying to defend himself, and pleading with the men to stop while they cursed at him. Kozorra testified there were "four or five people all striking him at the same time. So… any inch you could get, people were hitting him." During the beating, the plastic on one of the walls was ripped, resulting in a bloody handprint being left behind:



The men peeled Staton's shirt off over his head, exposing his coveted 1488 patch on the right side of his torso. One of the men retrieved a propane torch out of one of the vehicles and used it to heat up a large knife. Kozorra knelt behind Staton and held him up under his arms while the others took turns using the heated knife to burn his 1488 patch off his body. The smell of burning flesh filled the room.

By this point, Staton was so badly beaten that it was clear he would not survive without medical treatment. The conspirators decided that they could not take the risk that Staton would go to the police, and that it was better to simply get rid of him. They rolled Staton up inside the plastic and carpeting from the room. Staton was so tightly wrapped up that his body was not visible below the neck. King asked Staton if he wanted some water.

*U.S. v. Craig King*
No. 3:19-cr-00026-5-TMB	Page 11 of 20

Case 3:19-cr-00026-TMB   Document 1299   Filed 01/19/23   Page 11 of 20

Staton was semi-conscious and barely able to respond. King got some bleach from the other room and poured it down Staton's throat.

The men dragged Staton, bound and rolled up inside the carpet and plastic, out of the duplex and laid him on the ground near Baldwin and O'Dell's Tahoe. Felicia King yelled obscenities at Staton, including, "You piece of s***! You steal from me? We let you in the house!"

King directed everyone who was in the room during the beating and depatching to remove their clothes, which were covered in blood, and put them in a burn barrel. He and Felicia burned the clothing. Felicia provided everyone with replacement clothing, and then she and Beau Cook cleaned the vacant half of the duplex where the beating occurred. King gave everyone some drugs as a "thank you." Clowers told King that they were even for a $300 debt that Clowers owed him for a car. King agreed they were now square.

The men put a blue tarp in the rear cargo area of the Tahoe, and then loaded Staton on top of the tarp. Baldwin and O'Dell drove away in the Tahoe with Staton, bound, wrapped tightly in plastic and carpeting, in the back. They drove him to a remote location in the woods outside Wasilla, shot him, and burned his body. A moose hunter discovered his remains a month later, along with burned remnants of the blue tarp, pieces of rope and duct tape, and several .380 shell casings.

A few days later, Beau Cook visited King and asked him what happened after Baldwin and O'Dell drove away. King said that they took Staton somewhere and finished

*U.S. v. Craig King*
No. 3:19-cr-00026-5-TMB					Page 12 of 20

Case 3:19-cr-00026-TMB   Document 1299   Filed 01/19/23   Page 12 of 20

him off by shooting a round in each eye. King assured Cook that there would be no DNA evidence because the other conspirators burned the vehicle.

## II. CHARGES AND CONVICTIONS

King, along with codefendants Filthy Fuhrer, Roy Naughton, Glen Baldwin, and Colter O'Dell, proceeded to a jury trial beginning on March 14, 2022. After a trial that lasted more than a month, the jury found King guilty of all five counts in which he was charged:

- Count 1 – Racketeering Conspiracy, in violation of 18 U.S.C. § 1962(d),
- Count 2 – VICAR Conspiracy, in violation of 18 U.S.C. § 1959(a)(5) and (6),
- Count 3 – Kidnapping Conspiracy, in violation of 18 U.S.C. § 1201(c),
- Count 4 – Kidnapping Resulting in Death, in violation of 18 U.S.C. § 1201(a)(1),
- Count 5 – VICAR Murder, in violation of 18 U.S.C. § 1959(a)(1).

After the trial, King got a new tattoo on his knuckles of the numbers "5222" – representing May 2, 2022, the date the jury returned its verdict. PSR at ¶ 74.

## III. SENTENCING CALCULATIONS

All five counts are grouped for guideline calculation purposes. The base offense level for Racketeering Conspiracy, where the underlying racketeering activity is first degree murder, is 43. USSG §§ 2E1.1(a)(2), 2A1.1(a). The probation officer did not assess any other enhancements or adjustments. The total offense level is thus 43.

Although King has nine prior convictions for which he served a period of incarceration, most of them are too old to count towards his criminal history. His only

*U.S. v. Craig King*
No. 3:19-cr-00026-5-TMB	Page 13 of 20

Case 3:19-cr-00026-TMB   Document 1299   Filed 01/19/23   Page 13 of 20

qualifying offenses are a pair of misdemeanor convictions for Driving While Under Suspension in 2008. PSR at ¶¶ 59-60. The three criminal history points resulting from those two convictions place him in Category II. With a total offense level of 43, and a Criminal History Category of II, the guideline range is life.

Both Count 4 (Kidnapping Resulting in Death) and Count 5 (VICAR Murder) carry a mandatory sentence of life imprisonment. *See* 18 U.S.C. § 1201(a); 18 U.S.C. § 1959(a)(1).

## IV. OBJECTIONS TO THE PRESENTENCE REPORT

Neither party submitted any unresolved objections to the presentence report.

## V. APPLICATION OF THE 18 U.S.C § 3553 SENTENCING FACTORS

The government submits that the sentencing factors in 18 U.S.C. § 3553(a) demonstrate that a sentence of life imprisonment is sufficient, and no greater than necessary, to comply with the purposes of felony sentencing.

a. *The nature and circumstances of the offense.*

Craig King originated the plot to kidnap, assault, and murder Michael Staton. King continually pushed the members of the 1488s over a year to deliver Staton to him so he could exact revenge for some alleged thefts. He allowed them to use his house for the crime. He had Beau Cook prepare a kill room by laying plastic down over the walls and carpet because of how much of Staton's blood he knew would be shed. He personally participated in the vicious 5-on-1 beating of a bound and defenseless victim. He supervised as the conspirators rolled Staton up inside the bloodstained plastic and carpeting and loaded him into the bed of

the Tahoe to be driven away to his death. He provided everyone present with a change of clothes and burned their old clothes in a burn barrel to conceal evidence. Afterwards, he gave the 1488s present drugs as a way of thanking them, and later boasted about Staton's murder to Beau Cook. He has never, at any point, expressed any remorse for anything he has done.

It is true, as King argued at trial, that the 1488s also sought to punish Staton for violating their gang's rules. But the September 14, 2016 call between Filthy Fuhrer and Roy Naughton makes clear that a significant part of the reason Naughton sought a "greenlight" against Staton in the first place was because King claimed that Staton stole from him and his wife ("ripped off Red and White"). King's motives were intertwined with those of the 1488s to bring about a common end against a common enemy. The nature and circumstances of the offense that followed are among the most heinous and depraved this Court will ever see.

b. *The history and characteristics of the defendant.*

King's history and characteristics provide very little mitigation. He is a longtime associate of two violent white supremacist gangs, the Hells Angels and the 1488s. Although he is in Criminal History Category II, this is primarily a result of the fact that nearly all his convictions occurred outside the relevant timeframe and could not by law be counted towards his criminal history point total. There was also extensive testimony at trial that King was a drug dealer who traded large quantities of drugs and guns. This is consistent with the PSR, in which King claims that he "worked from home" prior to his arrest, but "could not recall his income or how many hours per week he worked" over the past 15 years. PSR at ¶ 84. He dropped out of high school, has no degrees, no vocational training, and says that he has no

interest in obtaining a GED or receiving substance abuse treatment. He has no history of mental or emotional health problems.

    c. *The need to reflect the seriousness of the offense and promote respect for the law.*

The legislative history of § 1959 and § 1201 demonstrate that Congress considers those offenses among the most serious crimes existing under the laws of this country. Originally, both crimes were punishable by any term of years up to life. In 1994, however, Congress amended § 1959 to require at least a mandatory minimum of life imprisonment for murder in aid of racketeering. *See* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 60003(a)(6), 108 Stat. 1796, 1969-1970 (1994) (changing the penalty provision from "any term of years or life" to "death or life imprisonment"). In the same bill, Congress amended § 1201(a) to require at least a mandatory minimum of life imprisonment where death results from a kidnapping. *Id.* at § 60003(a)(12), 108 Stat. at 1970 (inserting the words "and, if the death of any person results, shall be punished by death or life imprisonment"). By doing so, Congress recognized the irreparable and incalculable harm that occurs when a life is taken in the commission of those offenses and expressed its belief that only the sentences of death or life imprisonment were significant enough to reflect the seriousness of those crimes.

The tragic and grisly details of Michael Staton's death attest to the wisdom of that belief. His attackers bound him, beat him, mutilated his body with a hot knife, and poured bleach down his throat, all while he begged for his life. They then rolled him up inside plastic and carpeting, drove him out to the woods, shot him, and burned his body. That conduct

warrants no less than a sentence of life imprisonment.

    d. *The need to afford adequate deterrence.*

Specific deterrence is not a factor in this case, given that King will be spending the rest of his life in prison. General deterrence, however, deserves some weight in the Court's analysis. The 1488s are also known to review the legal filings in cases involving their members. Unlike many prosecutions, this case has an audience – whether they are in the courtroom for sentencing or not. This case has also garnered significant attention in the media. Given that the 1488s are likely to review the filings and media coverage of this case, a sentence of life imprisonment will be more likely to deter them and other violent gangs from committing violent crimes in the future.

    e. *The need to protect the public from further crimes.*

A sentence of life imprisonment will guarantee that the public is protected from King for the duration of his lifetime.

    f. *The need to avoid unwarranted sentence disparities.*

The PSR notes that the average nationwide sentence over the past five years for defendants whose primary guideline was § 2A1.1 (first degree murder) was 399 months. But this includes all defendants sentenced under the first degree murder guideline, rather than those (like King) convicted of the more specific offenses of Death Resulting in Kidnapping and VICAR Murder. For those offenses, the mandatory sentence is life imprisonment.

In this district, the government is aware of the following federal homicide cases (excluding the cooperating codefendants in this case) in which the primary sentencing

guideline was § 2A1.1:

| Defendant | Case No. | Sentence | Date of IOS |
|---|---|---|---|
| Raymond Cheely | 3:92-cr-00073-JKS | Life | 7/13/1995 |
| Abram Walter | 4:96-cr-00026-HRH | Life | 7/25/1997 |
| Ronald Geiger | 3:96-cr-00108-JWS | Life | 11/5/1997 |
| Joshua Wade | 3:07-cr-00111-RRB | Life | 2/22/2010 |
| Javier Martinez | 3:11-cr-00103-RRB | 780 months | 12/16/2014 |
| James Wells | 3:13-cr-00008-SLG | Life | 1/14/2020 |

A sentence of life imprisonment will not result in any unwarranted sentencing disparities between King and similarly situated defendants.

 g. *The need to provide restitution to any victims.*

Restitution is mandatory in the case of a defendant who has committed a crime of violence. 18 U.S.C. § 3663A(a)(i), (c)(1)(A)(i). The government requests restitution to the State of Alaska Violent Crimes Compensation Board (VCCB) regarding expenses made by the VCCB on behalf of the Michael Staton's brother. The VCCB's purpose is to "facilitate and permit the payment of compensation to innocent persons injured, to dependents of persons killed, and to certain other persons who by virtue of their relationship to the victim as a crime incur actual and reasonable expense as a result of certain serious crimes[.]" AS 18.67.010. Under Alaska law, a person eligible for compensation (such as the immediate family member of a homicide victim) can apply to the VCCB for compensation for things like airfare, lodging, or counseling.

*U.S. v. Craig King*
No. 3:19-cr-00026-5-TMB     Page 18 of 20

Case 3:19-cr-00026-TMB   Document 1299   Filed 01/19/23   Page 18 of 20

Michael Staton's brother David applied to the VCCB for compensation for expenses incurred in traveling to Alaska for the sentencings. The government is filing under seal, as part of its sentencing addendum, copies of his receipts establishing expenses in the amount of $3,184.60. The VCCB will reimburse that amount, plus $50 a day per diem for six days, for an overall total of $3,784.60. The government therefore asks the Court to order the defendant to pay restitution to the VCCB for $3,784.60, jointly and severally with the other four codefendants. The special assessments of $500.00 are mandatory.

## VI. BOP PLACEMENT

Finally, the government requests that this Court not make a recommendation as to which facility the defendant will be placed. Given the defendant's role in an organized and hierarchical racketeering enterprise, the 1488s, the Bureau of Prisons is best situated to determine placement in a way that will minimize institutional security risks and the ability of the defendants to orchestrate continued criminal activity.

## VII. CONCLUSION

For the foregoing reasons, the government respectfully asks this Honorable Court to impose a sentence of life imprisonment, restitution in the amount of $3,784.60, and a $500 mandatory special assessment.

RESPECTFULLY SUBMITTED January 19, 2023, in Anchorage, Alaska.

S. LANE TUCKER
United States Attorney

*s/ Christopher D. Schroeder*
CHRISTOPHER D. SCHROEDER
Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on January 19, 2023, a copy of the foregoing was served via the CM/ECF system on:

Bradly Carlson

*s/ Christopher D. Schroeder*
Office of the U.S. Attorneys